**SHAW, Banking Com'r, et al. v. SAN PATRICIO COUNTY et al. .**

No. 1420—6350.

Commission of Appeals of Texas, Section B.
June 24, 1933.

John W. Goodwin, Jay H. Brown, and Chas. L. Black, all of Austin, for plaintiffs in error.

Boone & Raymer, of Corpus Christi, John W. Gaines, of San Antonio, and W. B. Moss, of Sinton, for defendants in error.

LEDDY, Judge.

San Patricio county brought this suit against the Commercial State Bank of Sinton, Tex., the Sinton State Bank of Sinton, Tex., James Shaw, banking commissioner of the state of Texas, and B. R. Smith, special liquidating agent for the latter named bank. It sought to establish a prior right to cer-

tain funds it had deposited with the Sinton State Bank as its depository.

It appears that in 1931 the Sinton State Bank, in response to due advertisement by the county, made its bid to be selected as the depository for county funds. This bid was accepted by the county and the bank duly qualified as depository.

About the 3rd day of October, 1931, said bank became unable to meet its obligations. By the voluntary act of the board of directors it was placed in the hands of the banking commissioner for liquidation. At the time said bank went into liquidation, the county had funds on deposit with it as depository in the sum of $386,507.54, which included funds of common school districts and reclamation and conservation districts. Prior to the time said bank ceased to do business, it had loaned of county funds to the Commercial State Bank of Sinton the sum of $158,373.85, under agreement by the latter to pay the same rate of interest that it had agreed as county depository to pay for the use of said funds.

The county made demand upon the banking commissioner, and the Commercial State Bank for the payment of the county funds loaned to it by the Sinton State Bank. This demand was refused by the banking commissioner upon the ground that San Patricio County was entitled to share only in the assets of the Sinton State Bank on the same basis as other creditors.

The county thereupon instituted this suit in which it sought to establish a prior right and title to said funds. The banking commissioner and liquidating agent of the Sinton State Bank claimed the county funds on deposit with the Commercial State Bank as a part of the assets of the Sinton State Bank.

The basis for the county's contention that it had a prior right to said county funds against the claim of the banking commissioner that such funds constituted assets of the Sinton State Bank and the county could only claim as a general creditor of the bank rests upon the following facts set forth in the county's petition:

It was alleged that during the years 1921 and 1923, when the matter of the selection of a depository for the county and its funds came up for consideration, the Commercial State Bank and the Sinton State Bank entered into an agreement, arrangement, or understanding, the effect of which was to stifle competition and prevent competitive bidding, and that said agreement was observed in each instance when a county depository was selected. The effect of such agreement was that the Sinton State Bank would be the highest and best bidder for such funds, and would continue as county depository of said county, and that each of said banks would receive a division of the funds of said coun-

ty, at the specific rate of interest agreed upon by them; that said agreement, arrangement, and understanding between said banks was substantially observed and continued in full force and effect every two years when the county depository was selected, and that in each instance the Commercial State Bank, with knowledge of the bid proposed to be made by the Sinton State Bank, made its proposal or bid at a lesser rate of interest than that proposed and bid by the Sinton State Bank, or made no bid at all, so that said arrangement would continue to be observed and carried out.

It was further averred that, pursuant to said collusion, combination, arrangement, understanding, and agreement made as aforesaid, when bids were called for by the commissioners court of San Patricio county for the county funds as prescribed by law, and the selection of the county depository for the biennium beginning in 1931, the Sinton State Bank made its proposal and bid for said funds, and the Commercial State Bank did not make any proposal or bid therefor; that the Sinton State Bank was the highest bidder, and was therefore selected as county depository for county funds, and that it duly qualified by making the required depository bond; that thereafter, in pursuance of such understanding and agreement entered into and continued in effect by said banks, the Sinton State Bank divided the deposit of said county funds with said Commercial State Bank, and turned over to the latter bank the sum of $158,373.85 of said county funds, requiring it to execute a bond to secure the repayment of said funds; that by reason of said unlawful agreement aforesaid the deposit made by the Sinton State Bank with the Commercial State Bank became and was the funds of the county, and did not belong to the Sinton State Bank; that, when the Sinton State Bank ceased to do business, the county made demand upon the Commercial State Bank and the state banking commissioner for the repayment to it of all the county funds held by said bank under the unlawful agreement aforesaid, which demand was by said official in all things denied.

The county alleged in the alternative that, if it were not entitled to recover said funds on deposit with the Commercial State Bank because of said unlawful agreement, by reason of the facts alleged the Commercial State Bank became a depository of the county, and that said bank owed said funds to the county, and that it was entitled to recover from said bank as its depository.

The Commercial State Bank answered, denying any intention upon its part to stifle competition or engage in an illegal undertaking. It admitted that it had the sum of $158,373.85 as the balance of moneys deposited from time to time with it by the Sinton State Bank pursuant to and under the terms

of an agreement existing between the said two banks. It averred its willingness to pay over such sum to the rightful owner whenever such fact should be judicially determined.

The state banking commissioner answered to the effect that in making the bid in 1931 for county depository the Sinton State Bank was acting for itself, and that there was no agreement or understanding express or implied with the Commercial State Bank that the latter would not make a bid to be selected as county depository or, if it did, that it would bid a less rate of interest than that offered by the Sinton State Bank. All of the allegations with reference to the unlawful agreement alleged by the county were specifically denied.

The case was submitted to the court without a jury. Judgment was rendered denying the county a prior right to the funds in question, and the Commercial State Bank was directed by said judgment to deliver said funds, amounting to $158,373.85, to James Shaw, banking commissioner, for the credit of the Sinton State Bank.

Upon appeal to the Court of Civil Appeals, the judgment of the trial court was reversed, and judgment was rendered in favor of San Patricio county against the Commercial State Bank for the sum of $158,373.85, with interest from October 3, 1931, to November 4, 1931, at the rate of 2½ per cent. per annum. 52 S.W.(2d) 334.

The county sought to establish the making of the unlawful agreement between the Commercial State Bank and the Sinton State Bank by the testimony of Mr. Sparks, vice president of the Commercial State Bank. He was the only witness who gave testimony upon this subject. He testified to a conversation occurring in 1921 or 1923 between himself and the Messrs. Odem of the Sinton State Bank. He admitted that he told them at this time what he was going to bid on that particular letting, and also that he expressed the opinion to them that the Sinton State Bank was bidding too high for the use of the county money. He further admitted that on other occasions he expressed the opinion that they were bidding entirely too high. He specifically denied, however, the making of any agreement with them at any time in respect to the amount of their bid or the bid of his bank. He testified that the agreement of 1921 or 1923 had reference merely to the division of the funds after the depository had been selected. This witness detailed the conversation had on this subject in 1921 or 1923 as follows:

"Q. And the substance of your agreement was, whichever bank got it, they would let the other bank have one-half of the funds at the same rate of interest that they were paying the county? A. That's right.

"Q. But there was no express understanding that you would not bid for your bank, or what amount you would bid? A. No, there was not.

"Q. All you did, you told them you thought they were bidding too much, and you told them what you were going to bid? A. I did at one time—and I always told them they were paying too much.

"Q. Did you have a second conversation of the same nature after this 1921 or 1923 conversation? A. Well, I don't recall, but I presume we did, we were friendly and more than likely did meet and discuss this matter—we never met anywhere to discuss it, as I recall, but more than likely we did discuss the matter.

"Q. In 1931, when the Sinton State Bank was selected the last time, was there any understanding or agreement had between your bank, the bank you represented, and the Sinton State Bank about bidding? A. No, sir—not a word.

"Q. Was there any understanding about what either bank would bid? A. No, sir.

"Q. Was there any understanding that your bank would not bid against the Sinton State Bank? A. No, sir.

"Q. Was there at that time any understanding or agreement about the division of the money? A. No, sir—there was no understanding or agreement about the division of the money in 1931 or as I recall, two years prior to that time.

"Q. In 1929 and 1931, then? A. No, sir. But we were left some money both years.

"Q. Could your bank or the other bank have stood to take all that money? A. No, I don't recall that we bid."

On the question as to his bank's continuing to pay the Sinton State Bank interest on approximately one-half of the county funds for the years 1927, 1929, and 1931, when it had submitted no bids during these years, he testified:

"Q. Counsel asked you if it wasn't a fact that you continued during six years to pay the same rate of interest to the Sinton State Bank as it was paying to the County although you made no bid: Did you or not exercise any influence or do anything in any way or have any understanding or agreement that would in any manner affect the Sinton State Bank's bidding on the funds? A. No, sir.

"Q. You did not. A. No, sir.

"Q. Did you know what it was going to bid? A. I did not.

"Q. You did nothing to affect that in any way? A. No, sir.

"Q. In view of your having taken a part of the money—You already had some of the funds on hand, didn't you? A. Yes, sir.

"Q. Your bank didn't expect that bank to

do the unfair thing and try to get it all away from you immediately? A. Well I knew they wouldn't do that—I had had dealings with them.

"Q. And if they wanted to place some of the funds with you, why, you would carry them? A. Yes, sir.

"Q. But insofar as it bidding on the funds was concerned, you had nothing to do with that? A. No, sir.

"Q. In no shape, form, or fashion? A. No, sir."

The case was tried without a jury. The trial court was the judge of the credibility of this witness and of the weight to be given his testimony. In support of the trial court's judgment, we must assume that it accepted the most favorable view of the testimony of the witness Sparks of which it was reasonably and fairly susceptible.

It may be that the trial court would have been justified in disregarding the positive testimony of the witness Sparks that no agreement or understanding was made between the banks with reference to the bids to be submitted by the Sinton State Bank for the year 1931. The testimony of the witness that each year the Sinton State Bank's bid was the highest bid, and that said bank allotted each year approximately one-half of the funds to the Commercial State Bank, might have justified the inference that the arrangement was the result of a prior agreement. If judgment had been rendered in favor of the county, then the appellate court would have been compelled, in support of that judgment, to indulge all inferences that the trial court might have properly drawn from this witness' testimony. But it was clearly within the province of the trial court to accept the direct and positive statement of this witness that no agreement or understanding whatever was had between the banks with reference to bidding or the awarding of a portion of the funds by the Sinton State Bank to the Commercial State Bank for the year 1931. The trial court had the right to believe the testimony of this witness to the effect that during that year the Commercial State Bank could not have profitably used the full amount of the county funds, and that it was therefore not interested in bidding for or obtaining all of such funds. It appears from Mr. Sparks' testimony that he was of the opinion that the Sinton State Bank was not in position during that year to use profitably the full amount of the county funds. If this were true, he had no reason to fear that the Sinton State Bank would not divide the county funds with his bank. At any rate, it was plainly the prerogative of the trial court to accept the witness Sparks' view upon this subject. In support of its judgment we must presume that it did so.

The reversal and rendition of the judgment by the Court of Civil Appeals can be sustained only upon the theory that the witness Sparks' testimony shows as a matter of law that the agreement alleged by the county was entered into between the two banks in 1921 and 1923 and continued in force throughout the years up to and including 1931. An appellate court cannot declare a fact established by the evidence as a matter of law when such fact is specifically and positively denied by the only witness who testifies upon the subject, and his testimony is accepted by the trial court. The testimony of this witness, if fully believed, clearly justified the judgment rendered by the trial court, and the Court of Civil Appeals erred in not so holding.

The judgment of the Court of Civil Appeals should be reversed, and the judgment of the trial court affirmed.

CURETON, Chief Justice.

The judgment of the Court of Civil Appeals is reversed, and that of the district court is affirmed, as recommended by the Commission of Appeals.